245 P.2d 835

**SILVA v. HAAKE et al.**

No. 5487.

Supreme Court of New Mexico.

June 11, 1952.

Rehearing Denied July 14, 1952.

Simms, Modrall, Seymour & Simms, Albuquerque, for appellants.

O'Sullivan & Dunleavy, Albuquerque, for appellee.

COMPTON, Justice.

This is an action against the master for damages allegedly caused by the negligence of the servant.

Appellant is a contractor engaged, among other things, in the construction of bridges. At the time material, he had four projects under construction, one of which was situated at New Laguna, north of Laguna, New Mexico. The foreman of the New Laguna project was Guy Gibson. His crew consisted of Hathaway, a shovel operator; Owen Daniel Freeman, a carpenter, and Amabil Lopez, his helper. Also, there were four unskilled laborers. On the night of November 11, 1950, a truck driven by Freeman was involved in a collision with a motor vehicle operated by appellee near Grants, New Mexico, resulting in serious personal injuries and property damage to appellee.

The complaint charges the negligent operation of appellant's truck, by Freeman, as a proximate cause of the alleged injuries. The answer denies all material allegations

and pleads contributory negligence. A counterclaim for damages charges appellee with the negligent operation of his automobile. The cause was tried to a jury and following the verdict judgment was entered against appellant, Haake, from which the appeal is taken.

The basic question is whether Owen Daniel Freeman was acting within the scope of his employment at the time of the accident. We answer the question affirmatively. There is an abundant evidence in the record to support the conclusion.

Although the evidence is conflicting, it tends to establish the following facts which are summarized. On November 11, 1950, about noon, the foreman and shovel operator, Hathaway, were taken off the job, presumably by appellant, leaving Freeman and five other employees, none of whom lived at the work site, to complete the project which required about one week. Freeman and Hathaway lived together at San Fidel, some 15 miles west of Laguna. Their work hours were from 7:00 o'clock in the morning to 12:00 noon, and from 12:30 to 5:30 in the afternoon. They ate their morning and evening meals at San Fidel but took their lunches with them. Transportation was furnished by appellant. Previous to the time Gibson and Hathaway left the project, Gibson, the foreman in charge, provided drinking water for the employees, using water bags as containers. When Gibson and Hathaway left, however, they took all water bags with them. Freeman was the only skilled workman left on the job and when Gibson left, he was directed to supervise its completion. A tool truck used on the project was then provided by Gibson as a means of transportation for Freeman and Lopez. Believing it to be his duty to provide drinking water for the men on the project, Freeman decided to purchase other water bags. That evening, accompanied by Lopez, Freeman drove the truck to San Fidel, arriving there about 7:30 or 8:00 p. m. They bathed, changed clothes, and ate their evening meal after which they went to Grants to make the purchase, using the truck as a means of conveyance. Grants is about 15 or 20 miles west of San Fidel. They arrived there after closing time, nevertheless made inquiry at various service stations in an effort to purchase containers, but without success. While in Grants, each drank a bottle of beer and a Coca Cola. On their return to San Fidel the truck, while being driven by Freeman, was involved in a collision, causing appellee's injuries. Neither negligence, contributory negligence, nor the extent of appellee's injuries are issues for determination.

When a verdict is attacked as being unsupported, it is the duty of the appellate court to view the evidence in the most favorable aspect, indulging in all reasonable inferences to be drawn therefrom, and disregarding all unfavorable testimony and

inferences, to sustain the verdict. Whether there is substantial evidence from which the jury might reasonably determine that Freeman was within the scope of his employment in his endeavor to furnish drinking water for the men, may be found from his own testimony. We quote:

"* * *

"Q. Let's get down to the time of the accident. Was it customary for the foreman or superintendent on these jobs that Haake was doing over the state and in Colorado, greater or smaller in extent to provide drinking water for the thirsty employees on those jobs?

"Mr. Modrall: May it please the Court, before the witness answers, we object to the question unless it be shown that Mr. Freeman was familiar with all of these jobs. There has been no foundation laid for this question being asked as to what was customary on the rest of Haake's jobs.

"Mr. O'Sullivan: I will withdraw the question with respect to the other jobs that Mr. Haake has been doing. We will just talk about the one at New Laguna.,

"Q. Was it customary for Mr. Gibson to furnish drinking water to the workmen during working hours? A. It was always customary for the one in charge to see that water was provided.

"Q. On the evening of November 11th, Mr. Freeman, what did you go to Grants to get? A. Water bags.

"Q. What were you going to do with the water bags, Mr. Freeman? A. I was going to provide water for the laborers.

"Q. On Mr. Haake's job at New Laguna, isn't that right? A. That is right.

"* * *

"Q. So it would take men working for Mr. Haake on an hourly basis a quarter of a mile to get a drink of water unless you or he or his other foreman supplied water in the bags right there on the job? A. Yes, sir.

"Q. That would be a lot of time off every time the men wanted a drink, wouldn't it?

"* * *

A. Yes, sir.

"Q. So you supplied the water bags for Haake's men to get a drink from without having to take so much time off, isn't that right? A. That is right.

"Q. It was for Haake's benefit as well as the men's wasn't it? A. Yes, sir.

"* * *"

■ The rule is well established that where a servant is directed to accomplish a given result and no means are provided

therefor, he is authorized to do anything which is fairly and reasonably regarded as incidental to the work specifically directed.

American Law Institute, Restatement, Agency, § 35, says:

"Unless otherwise agreed, authority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it.

"Comment:

"(b) The rule stated in this Section is one of most frequent and wide application. Under it, the appointment of a person to a certain position or a direction to him to do a specified act or to accomplish a specified result indicates, in the absence of countervailing circumstances, that the principal consents to the performance of acts on his behalf which are incidental to or usual or reasonably necessary in the position or in the doing of the act or in the accomplishment of the result.

"Illustration:

"(2) P employs A to obtain photographs illustrating Eskimo life. A finds it necessary, in order to obtain photographs, to employ an interpreter and to make small gifts to the Eskimos to induce them to permit him to make photographs. Nothing to the contrary having been manifested by P, A's authority includes authority to employ an interpreter and procure gifts. * * *"

Further, Section 229, op. cit., says:

"(1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.

"(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

"(a) whether or not the act is one commonly done by such servants;

"(b) the time, place and purpose of the act;

"(c) the previous relations between the master and the servant;

"* * *

"(f) whether or not the master has reason to expect that such an act will be done;

"(g) the similarity in quality of the act done to the act authorized;

"(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

"(i) the extent of departure from the normal method of accomplishing an authorized result; and * * *"

In view of the established custom, it would reasonably appear that the employer expected to provide such essentials as drinking water for his employees and that Freeman would make provisions therefor.

Appellee called Freeman as an adverse witness under Rule 43(b), our Rules of Civil Procedure. Freeman testified that Gibson, the foreman, left him in charge, directed him to supervise the project and to use the truck for transportation. As previously stated, Freeman testified fully as to instructions given him by Gibson with regard to completing the job. It is argued that such testimony was hearsay since Gibson was unauthorized to delegate his authority to Freeman. Appellant attacks the admission of this testimony as if appellee had called some witness to testify as to statements made by Freeman as to the extent of his authority, overlooking the fact that Freeman was testifying as a witness.

It is stated in Restatement, Agency, § 285:

"Evidence of a statement by an agent concerning the existence or extent of his authority is not admissible against the principal to prove its existence or extent, * * *".

Comment (a), however, states:

"The rule stated in this Section does not deal with testimony by an agent. A person may testify as to the facts which it is alleged constitute his au-thority, and his testimony may be introduced either by or against the alleged principal. * * *"

The rule is stated in 4 Wigmore on Evidence, section 1078, p. 125, as follows:

"* * * And of course nothing prevents the alleged agent from *testifying upon the stand* to the fact of his agency; * * * testimony is not offered as an admission." (Emphasis ours)

■ Admittedly, Gibson was appellants' superintendent on the project. He was authorized by Haake to employ his own crew, to accomplish the work at hand, and it will be observed that Freeman was retained as supervisor until the project was completed. We are of the opinion that Gibson was merely exercising his authority as superintendent in directing the work and that the testimony of Freeman relating to instructions given him by Gibson, were admissible.

■ The final question presented by this appeal is whether the trial judge erred in permitting appellee to call Freeman as an adverse witness, eliciting from him evidence against appellant and then dismissing the action as to Freeman.

The record discloses that at the close of the case appellee moved for a dismissal as to Freeman, and appellant assented thereto. Subsequently, however, he moved for a mistrial on the ground that appellee had

invoked the adverse party rule in bad faith, merely to elicit otherwise objectionable testimony against appellant. As we understand the rule, parties to an action may be dropped by order of the court on motion of any party or of its own initiative at any stage of the proceeding on such terms as it may deem just. Rule 21, our Rules of Civil Procedure. While Freeman was a codefendant, it is not shown that he was hostile to appellant. On the other hand, the contrary appears from the evidence. The question must be left to the wise discretion of the trial judge.

The judgment will be affirmed and it is so ordered.

LUJAN, C. J., concurs.

McGHEE, Justice (specially concurring).

I concur in the opinion by Mr. Justice COMPTON, but desire to add a few words of my own.

In view of the record and the verdict of the jury we must accept the claim Freeman made the trip to Grants to purchase water bags in order to provide water on the job for the men working there. It is true this was first established by the plaintiff through leading questions when he called Freeman as an adverse witness in his case in chief. Freeman gave the same testimony on direct examination while testifying for the defendants.

There remains then on this feature of the case the issue of whether through custom it was the duty and responsibility of the foreman to see that drinking water was provided on the job for the men. Such was the testimony of Freeman, and although it was denied by Haake the jury chose to believe the former. This finding, in my opinion, concludes that issue.

The undisputed testimony of Freeman was that when Superintendent Gibson left he appointed Freeman as foreman, turned the truck over to him to use for transportation, and instructed him to act as foreman until the bridge was completed. This issue was, like the others, fairly submitted to the jury under proper instructions, and resolved in favor of the claim of the plaintiff that Freeman was the foreman.

The testimony above detailed did not come as a surprise to the defendant Haake at the trial. Freeman's testimony had been taken by deposition before the trial when all parties were represented by counsel. It is true that Gibson had left the service of Haake and was working in Colorado, but there was no claim his deposition could not have been taken for use at the trial if there was any reason to believe Freeman had testified falsely in his deposition.

I see nothing inherently improbable in the testimony which supports the verdict.

SADLER, Justice (dissenting).

This judgment should not stand. It is based on the strange and inherently improbable story of a near midnight journey to Grants for the stated purpose of buying water bags and an alarm clock. Yet Freeman and Lopez admittedly spent practically the entire time while there in a saloon from which they emerged at 2 a. m., closing time, "staggering drunk" to become involved in the car wreck in which plaintiff was injured some 15 minutes later one mile from Grants enroute back to San Fidel, 15 miles away. They had not left San Fidel on this ill fated journey until 10:30 p. m., a few hours earlier.

The unreasonableness of Freeman's story of the midnight sortie to Grants to purchase water bags, et cetera, tested in the light of what subsequently transpired, compels the inference that he and Lopez went to Grants to put on a Saturday night "drunk" which they did, rather than to purchase an alarm clock and water bags which they did not, and as sensible men must have known they could not from the unseemly hour of their departure. Viewed against the background of admitted facts, Freeman's story of the purpose of his trip to Grants would have been scarcely less credible had he testified the wreck occurred while enroute to Flagstaff, Arizona, more than 200 miles distant, for the same purpose.

This story of the condition of Freeman and Lopez at time of the wreck is not surmise. It was given by plaintiff's own witness, a State Patrolman, the late Nash Garcia, officially present to investigate the wreck, who described them as "staggering drunk" and making such a nuisance of themselves in his effort to get the injured in an ambulance, that he placed both under arrest and later in jail at Grants for the night on drunk and disorderly charges.

The foregoing is but one aspect of the case which demonstrates the inherent improbability of the whole story told by Freeman, himself a codefendant. This testimony about purpose of the trip was first given when he was called to the stand for plaintiff on the pretense of being an "adverse" witness, thus licensing the leading question which produced the testimony of the supposed custom of water being provided by the employer, Haake, for men on the job. Yet this same witness and codefendant, *the one person directly responsible for plaintiff's injuries,* if either defendant was so, is favored by plaintiff's voluntary dismissal of him as a codefendant in his last appearance on the stand, thereby exposing the pretense of the character in which he had been called as an adverse witness.

Notwithstanding the bald statement from Freeman that there was such a custom, he testified as well that the only water bags used on the job prior to that time belonged to Hathaway; that the only ones used afterwards belonged to other men on the job;

that all were bought and paid for by them and that if he had been able to find water bags at Grants at the unseemly midnight hour when he claimed to have toured darkened stores and shops seeking them, they would have been paid for by him and would have belonged to him. Note his testimony, to-wit:

"Q. The water bags that you were going to get in Grants, how were you going to pay for them? A. Myself.

"Q. Did you expect to be reimbursed for the price of those bags? A. No, sir.

"Q. You didn't expect to be reimbursed for the bags any more than you expected to be reimbursed for your carpenter tools, did you? A. No, sir. * * *

"Q. Had Mr. Gibson or Mr. Hathaway or anyone told you to go to Grants to get a water bag and an alarm clock? A. No, sir.

"Q. Had anyone told you to provide or furnish a water bag on the job? A. No, sir."

Furthermore, there was a spring of fresh water almost within a stone's throw of the job (200 yards) from which water in buckets or pails easily could be brought to the job and kept on hand without the necessity of the men taking time off for water every time one wished a drink. It was mid-November and there was no danger of the water getting hot. So it is that the only custom involved, as shown by this same witness, Freeman, was for the men themselves to furnish drinking water while on the job in water bags, bought and paid for by them and taken from the job when they left, just as Hathaway had done.

Not one word of direction is shown either from defendant, Haake, or from his regular foreman, Gibson, touching any such custom. When asked about the supposed custom, Haake testified:

"Q. Was it your custom and state if you know whether it was a custom generally, for people in the construction business to furnish water bags and alarm clocks on the job? A. No, that is a good deal like furnishing lunch buckets. They furnish their own."

There must be some limit beyond which the courts will not go in upholding figmentary theories of liability arising on the relationship of master and servant, or principal and agent. In sustaining recovery in the case at bar, it seems to me, the outboundaries of liability under the doctrine of *respondeat superior* are left far behind. The journey to Grants, begun at 10:30 p.m., and from which the two employees were returning when the accident happened shortly after 2 a. m., even if occasion for the trip be true as stated, does not make the master liable. The facts show neither obligation nor custom on his part to pro-

vide water or water bags and it is indisputable that the practice was otherwise. The trip to Grants after work hours to get them took Freeman and his helper on a personal mission for which the master was in no sense responsible. Cf. McDonald v. Denison, 51 · N.M. 386, 185 P.2d 508; Paul v. Benavidez, 56 N.M. 328, 243 P.2d 1018, recently decided.

It is a familiar doctrine declared in the prevailing opinion, that of viewing the evidence in the aspect most favorable to the judgment, indulging all reasonable inferences and disregarding unfavorable testimony in order to sustain the verdict, when challenged as without substantial support. Williams v. Engler, 46 N.M. 454, 131 P.2d 267, and cases cited. It has not been overlooked in my consideration of this case. It is no more solidly imbedded in our jurisprudence, however, than that other rule which upholds the power of this court to overturn a verdict or finding based upon no evidence at all; testimony so inherently improbable as to be unworthy of belief; or otherwise unsubstantial. Phelan v. Phelan, 35 N.M. 36, 289 P. 996; State v. Armijo, 35 N.M. 533, 2 P.2d 1075; De Baca v. Kahn, 49 N.M. 225, 161 P.2d 630; Allen v. Allen, 52 N.M. 174, 194 P.2d 270; Ortega v. Koury, 55 N.M. 142, 227 P.2d 941; Southern Union Gas Co. v. Cantrell, 56 N.M. 184, 241 P.2d 1209. When the case is one calling for an application of the last mentioned doctrine very naturally the former

rule, the opposite of this one, is rendered inapplicable. This is such a case. At the time of the accident Freeman and Lopez were on a personal mission and their employer was no more responsible for the actions of either than if the wreck had occurred while out hunting or fishing. Cf. McDonald v. Denison, supra.

It follows from what has been said that my views and those of the majority do not accord. Accordingly,

I dissent.

COORS, J., concurs.